Joseph J. BROUSSARD, Appellant,

v.

SOCONY MOBIL OIL COMPANY, Inc.,
et al., Appellees.

No. 21544.

United States Court of Appeals
Fifth Circuit.

July 2, 1965.

J. Minos Simon, Simon & Trice, Lafayette, La., for appellant.

Austin W. Lewis, New Orleans, La., E. Gray Hayden, Dallas, Tex., Charles F. Rice, New York City, Charles B. Wallace, Dallas, Tex., W. M. Hall, Jr., New Orleans, La., Liskow & Lewis, New Orleans, La., of counsel, for appellees.

Before MARIS,* RIVES AND BROWN, Circuit Judges.

RIVES, Circuit Judge.

The plaintiff appeals from an order entered by the district court granting defendant's motion for summary judgment and dismissing the plaintiff's action for treble damages under the anti-trust laws.[1]

The question before this Court is whether the evidence and the inferences therefrom viewed in the light most favorable to the plaintiff are sufficient to show that there is no genuine issue as to any material fact concerning the plaintiff's claims of resale-price maintenance in violation of the Sherman Act and of a "tying" agreement in violation of the Clayton Act, and that the defendant is entitled to a judgment as a matter of law.[2]

The plaintiff operated a service station business in Lafayette, Louisiana, until February 12, 1962. The service station and its accompanying property, fixtures and equipment were leased by the plaintiff from Mobil Oil Company, a division of defendant Socony Mobil Oil Company, Inc.[3] The lease agreement

---

* Of the Third Circuit, sitting by designation.

1. See 15 U.S.C. § 15.

2. Rule 56(c), Fed.R.Civ.P.; Poller v. Columbia Broadcasting Sys., Inc., 1962, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458; United States v. Diebold, 1962, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176;

Kilfoyle v. Wright, 5 Cir. 1962, 300 F.2d 626, 629.

3. The district court dismissed Mobil Oil Company from the suit, on that defendant's motion. The basis for Mobil Oil's motion was that it has no assets and does not transact business in Louisiana. The district court noted that Mobil Oil is merely a department or division of Socony Mobil, the defendant.

on the Company's printed form, with typewritten inserts where applicable, was for a term of one year—"effective on and after the 13th day of February, 1961, and shall continue in effect for one (1) year thereafter." The lease agreement provided that the lessee, plaintiff, pay rent of "1½ cents per gallon through May 31, 1961 and thereafter —1½ cents for each gallon of motor fuel delivered into storage tanks at the premises, payable on delivery but no less than $150.00 per month * * *." Under the contingencies clause the lessor recognized that the "Lessee, in the operation of said service station, is engaged in his own personal, separate business, and no right is reserved by Lessor nor shall any right ever be exercised by Lessor to supervise, direct or control the manner or details of such business so conducted by Lessee or his agents or employees."

The plaintiff and defendant, through its division Mobil Oil Company, entered into a "Dealer Sales Agreement—Tank Wagon Bulk or Barrel Deliveries" on the same day the lease was made. By the terms of the Dealer Sales Agreement, the "Buyer [the plaintiff] agrees to purchase and receive from Seller [the defendant], and Seller agrees to sell and deliver" certain quantities of the defendant's gasoline and motor fuels. Paragraph 6 of the agreement provides that "if this contract contemplates delivery of such products at any real estate location leased * * * by Seller to Buyer * * * Seller cannot cancel this contract prior to the termination of such lease * * *." [4]

By affidavit filed in opposition to the defendant's motion for summary judgment, the plaintiff testified that D. P. Connell, general sales representative for the defendant, repeatedly insisted that the plaintiff reduce the retail sales price of gasoline by two cents a gallon. The plaintiff reduced his retail price as demanded and found he could not earn a living. The plaintiff raised his price to the former level. By deposition the plaintiff testified that approximately nine months after he opened the service station he was asked to reduce the price of gasoline:

"At that time I told the company supervisor that whenever the company would reduce the price of bulk I was willing to reduce and I would meet them half way, whereas, a few days later the company reduced the price of regular gasoline ninetenths of a cent to the gallon and I reduced two cents on regular * * *. [A]nd I dropped one cent on the premium * * *."

As noted above, the plaintiff raised his price to the former level. When the plaintiff refused again to reduce the retail price, D. P. Connell told him that he would have to vacate the premises on February 12, 1962. The plaintiff introduced the affidavit of two persons who testified that they were present at the plaintiff's service station between noon and one o'clock in the afternoon of January 31, 1962.

---

4. Paragraph 5 of the agreement provides:
"This agreement shall be effective from and after the day and year first above written, and shall continue in effect for one year thereafter, and after such year, from year to year until one party shall have given 30 days' written notice to the other party of intention to terminate this agreement on the expiration of the then current yearly period, subject, however, to paragraph 6 hereof. Such notice may be given during the first year to be effective at the end thereof or during any subsequent year, to be effective at the end of the then current year. Either party, at its option, in addition to all other available remedies may terminate this contract forthwith upon the other's failure to perform any of the obligations imposed upon the other by this contract, including, but not limited to, failure of Buyer to make full and prompt payment of all products purchased hereunder."

"They head (sic) Connell tell Broussard [the plaintiff] that if Broussard did not agree to reduce his retail sales price of gasoline by two cents a gallon and to follow the company's marketing program, the company would not renew Broussard's lease on said station."

The plaintiff's lease and dealer sales agreement were not renewed and the plaintiff vacated the station on February 12, 1962.

The pressure for reduction of prices was caused by the introduction of "Gulftane" gasoline in the area. "Gulftane" was posted at approximately 29 cents. D. P. Connell stated that "in posting one cent over what the prevailing retail posting on Gulftane * * * gave the dealer a good return on business, gave him a volume of gasoline business and also from that volume of gasoline business the sales of other products and services would give him actually an increase in net profit * * *." D. P. Connell admitted that at least one dealer other than the plaintiff reduced his price. However, he denied that there was an agreement to reduce prices:

"[W]e told all of the dealers at the same time that we had reduced our tank wagon eight-tenths of a cent, and that was the situation. If they wanted to do something about it, if they wanted to take our recommendation or if they didn't want to, that was their decision. That was the way I had explained it to Mr. Broussard, along with all other dealers in Lafayette."

■ Thus, under the evidence, genuine issues of fact existed as to whether the failure to renew plaintiff's lease and sales agreement were not occasioned by plaintiff's refusal to abide by either an express or implied agreement, combination, or conspiracy organized by defendant to secure adherence to its announced prices, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[5]

■ The defendant argues strenuously that its suggestions of prices to its dealers were for the purpose of encouraging competition. The defendant suggested a price reduction rather than an increase in order that its dealers might be more competitive with "Gulftane." The fact that the defendant's price "recommendations are based on competitive conditions" is immaterial. Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign channels of trade is illegal *per se*. Not unlike an agreement to raise prices, an agreement to lower prices prevents the determination of those prices by free competition alone.[6] In Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,[7] the Seventh Circuit had held that an agreement among competitors to fix maximum resale prices for liquor did not violate the Sherman Act because such prices promoted, rather than restrained, competition. The Supreme Court reversed and held that the Seventh Circuit had erred. The Court noted: "For such agreements no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."[8]

5. Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505.

6. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 222–223, 60 S.Ct. 811, 84 L.Ed. 1129.

7. 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

8. Id. at 212–213, 71 S.Ct. at 260.
The Louisiana Fair Trade Law, passed pursuant to the Miller-Tydings Amendment to section 1 of the Sherman Act and the McGuire Amendment to section 5 of the Federal Trade Commission Act, which exempts resale-price maintenance from antitrust prohibitions against price fixing is not applicable to the present suit. The ex-

**350**

We do not agree with the district court that the defendant's refusal to renew the plaintiff's lease was within the limits of the Colgate doctrine [9] of a unilateral refusal to deal. Involved is not only a refusal to sell gasoline to the plaintiff, but the termination of the plaintiff's entire service station operation. The lease agreement recognizes that the property and fixtures are used not only for the sale of gasoline but for the handling and sale of other petroleum products, automobile accessories, and auto services. (Lease agreement, clauses 3 & 6.) As stated recently by the Supreme Court: "Among the sources of leverage in Atlantic's hands are its lease and equipment loan contracts with their cancellation and short-term provisions. Only last Term we described the power implications of such arrangements in Simpson v. Union Oil Co., 377 U.S. 13 [84 S.Ct. 1051, 12 L. Ed.2d 98] (1964) * * *." Atlantic Ref. Co. v. FTC, 85 S.Ct. 1498, Civil Action Nos. 292 & 296, June 1965.[10]

Clearly, the defendant was not entitled to judgment, as a matter of law, on plaintiff's claim of resale-price maintenance in violation of the Sherman Act. We come then to the plaintiff's claim of a "tying" arrangement in violation of the Clayton Act.

The defendant sent the plaintiff to its training school for six weeks in Alexandria before he opened the service station. The plaintiff entered the training school before the lease agreement and dealer sales agreement for gasoline were made on February 8, 1961. At school he was trained in the defendant's marketing program. The marketing program embraces the merchandise that Mobil Oil sells. The plaintiff was instructed at the school that he would be expected to follow defendant's marketing program in the operation of the service station. The defendant's marketing program required that the plaintiff stock and sell tires, batteries and accessories, some of which were produced by companies other than defendant and some of which bore the defendant's trademark. The plaintiff stocked items from other suppliers similar to those he was required to stock by the defendant's marketing program, and was told by D. P. Connell that he was failing to follow the defendant's marketing program. After a conversation with D. P. Connell, the commission consignee for the bulk sale of defendant's petroleum products told the plaintiff that, if he would write a letter to the defendant saying that he would follow the marketing program and attach a financial statement and letter from his banker, the defendant would most likely continue him as a service station operator. As noted earlier, two persons testified by affidavit that they heard Connell tell the plaintiff that if the plaintiff did not agree to reduce his retail sales price of gasoline by two cents a gallon and to follow the Company's marketing program, the Company would not renew Broussard's lease on the service station.

emption provided by federal, see 15 U.S.C. § 1, and state law, see Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So. 2d 303 (1942); Fair Trade Law § 392; La.Rev.Stat. tit. 51, § 392 (1952), relates only to *minimum* price agreements.

9. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992.

10. Whatever the Colgate doctrine may have stood for in the past times, it means no more today than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. It allows each customer to decide independently to observe specified resale prices if induced to do so *solely* by a seller's announced policy. United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 43–44, 80 S.Ct. 503, 4 L.Ed.2d 505. On this summary judgment record, to hold that the defendant's actions do not establish a Sherman Act violation would serve to breathe new life into a doctrine we think fatally drugged by Parke, Davis & Co. See Adams-Mitchell Co. v. Cambridge Distributing Co., 2 Cir. 1951, 189 F.2d 913, 917 (Frank, J. dissenting).

The lease and the dealer sales agreement for gasoline were not renewed.

■ In granting summary judgment for the defendant, the district court stated that it was clear from the plaintiff's own testimony "that there was no agreement by him to handle only the accessory items distributed by defendant. As a matter of fact, he did handle other products and was free to do so, although this was discouraged by defendant and its employees." We do not agree that the absence of an agreement barring the plaintiff from purchasing those accessory items from suppliers other than the defendant entitled the defendant to a summary judgment.

■ Illegality may arise from an agreement by a party to sell one product, but only on the condition that the buyer also purchases a different (or tied) product.[11] Thus, in United States v. Loew's, Inc., a distributor of copyrighted motion picture feature films for television exhibition "licensed or offered

to license one or more feature films to television stations on condition that the licensee also license one or more other such feature films, and * * * refused, expressly or impliedly, to license feature films to television stations unless one or more other such feature films were accepted by the licensee."[12] The Court held that the tying agreements were illegal. In International Salt Co. v. United States,[13] the sale of salt was tied to the lease of salt-dispensing machines. The Court held the tying arrangement illegal, although the lessees were allowed to buy salt from other suppliers when they offered a lower price than defendant International.[14]

There was evidence to the effect that the defendant has sold or offered to sell gasoline on condition that the plaintiff also sell the defendant's tires, batteries and accessories and that the defendant has refused to sell its gasoline or lease its service station to the plaintiff unless the tires, batteries and accessories program was accepted by the plaintiff.[15]

11. See Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545. Of course, illegality may also arise if the buyer agrees that he will not purchase that product from any other supplier. See ibid.

12. 371 U.S. 38, 40, 83 S.Ct. 97, 100, 9 L.Ed.2d 11 (1962). The defendants were six distributors. However, the lower court as well as the Supreme Court rested its decision solely on the individual behavior of each in engaging in the licensing. See id. at 41, 83 S.Ct. 97. The significance of the copyright was that it supplied the economic power requisite to sustain the illegality of the tying arrangement. The Court stated: "The standard of illegality is that the seller must have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product * * *.' Northern Pacific R. Co. v. United States, 356 U.S. 1, 6 [78 S.Ct. 514, 2 L.Ed. 2d 545]. * * * The requisite economic power is presumed when the tying product is patented or copyrighted * * *." Id. at 45, 83 S.Ct. at 102.

13. 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

14. See also Northern Pacfic Ry. v. United States, 1958, 356 U.S. 1, 12, 78 S.Ct. 514, 2 L.Ed.2d 545.

15. We do not read the Supreme Court's recent decision in Atlantic Ref. Co. v. FTC, 85 S.Ct. 1498, Civil Action Nos. 292 & 296, June 1, 1965, to require a different result. In that case the Court affirmed judgments that a sales-commission plan between The Atlantic Refining Company and The Goodyear Tire & Rubber Company constituted an unfair method of competition in violation of § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U.S.C. § 45 (1964 ed.). The Court stated "that the Goodyear-Atlantic contract is not a tying arrangement." By an agreement between Atlantic and Goodyear, Atlantic "sponsored" the sale of tire, battery and accessory products of Goodyear to its wholesale outlets and its retail service station dealers. Atlantic was responsible for promoting the sale of Goodyear products to its dealers and assisting them in their resale; for this it

■ Not every business transaction which conditions the sale of one item on the purchase of another can be condemned as a "tying" arrangement or "monopolistic" practice to which serious legal risks should attach. A genuine "tying" agreement—properly subject to strict antitrust controls—presupposes a distinct and dominant product conferring some substantial economic power on the seller enabling him to coerce buyers of a different commodity in which he otherwise enjoys no competitive advantage.[16] For the "tying" arrangement to violate section 3 of the Clayton Act, it must be shown that its effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." A "tying" arrangement violates section 3 of the Clayton Act if the arrangement embraces a not "insignificant or insubstantial" volume of commerce in the "tied" supplies,[17] or whenever the supplier enjoys at least a dominant position in the "tying" market.[18] This "tying" market consists of the defendant's gasoline or, conceivably, its service station leases.[19] It is undenied that the defendant operates in more than twenty states and that its petroleum products constitute at least 10% of all such products sold and marketed in the several states in which it operates.

■ The defendant was not entitled to a judgment, as a matter of law, on the plaintiff's claim of a "tying" arrangement in violation of the Clayton Act.

■ While not necessary to the decision of this appeal, sound judicial administration calls for a review also of the plaintiff's contention that the district court has denied him the right of effective discovery under the Federal Rules of Civil Procedure. The plaintiff sought discovery through interrogatories of whether the defendant was engaged in activities involving its other independent dealers similar to the activities of which the plaintiff complains. His interrogatories were directed to the defendant and to the Chief, Division of General Trade Restraint, Federal Trade Commission. The district court sustained the defendant's objections to questions directed to it and to the Chief which related to the existence of complaints made against the defendant to the Federal Trade Commission, the identity of the complainants, and whether or not the Federal Trade Commission was conducting an investigation of defendant's activities in the area of monopoly and/or antitrust. No discovery whatsoever was permitted of the Chief. The district court gave no reasons in its order sustaining the defendant's objections.

received a commission on all sales made to its wholesalers and dealers. Goodyear was responsible for the sales and sold at its own price to Atlantic wholesalers and dealers for resale. Atlantic was not required to tie its sale of gasoline and other petroleum products to purchases of Goodyear tires, batteries and accessories. Nor did Atlantic expressly require such purchases of its dealers. The Court noted that the effect of the plan is similar to that of a tie-in and that "the Commission was warranted in finding that the effect of the plan was *as though* Atlantic had agreed with Goodyear to require its dealers to buy Goodyear products and had done so." (Emphasis in original.)

16. See Report of the Attorney General's Nat'l Comm. to Study the Antitrust Laws 144, n. 60 (1955).

17. International Salt Co. v. United States, 1947, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20; see Atlantic Ref. Co. v. FTC, 85 S.Ct. 1498, 1507, October Term, Nos. 292 & 296, decided June 1, 1965.

18. International Business Machs. Corp. v. United States, 1936, 298 U.S. 131, 56 S. Ct. 701, 80 L.Ed. 1085; United Shoe Mach. Co. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708.

19. See Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (requirement that lessee ship over lessor's railroad all commodities produced on land).

We fail to see how the information sought as to activities similar to those complained of is not relevant to the subject matter of the plaintiff's suit. The Supreme Court has recently stated that "[t]he greater resources and expertise of the [Federal Trade] Commission and its staff render the private suitor a tremendous benefit aside from any value he may derive from a judgment or decree [obtained by the Commission].[20] Indeed, so useful is this service that government proceedings are recognized as a major source of evidence for private parties."[21] The Court also noted that "[t]he pleadings, transcripts of testimony, exhibits and documents are available to [the private litigant] in most instances."[22] We think the district court should have permitted the plaintiff to seek discovery from the Federal Trade Commission officer. The defendant asserted below that the rules of the Commission do not permit the disclosure of the information which the plaintiff seeks. It may be that the Commission officer will decline to furnish the information sought on the ground that a department rule forbids such disclosure except upon permission of the head of the department, or he may assert some claim of privilege. However, the Commission officer is the proper person to raise such objections and not the defendant.[23] The district court has power to review the decision of the Commission officer not to furnish the information sought and to make a determination of the legitimacy of the claim of privilege.[24]

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

20. See section 5(a) Clayton Act, 37 Stat. 731, as amended, 15 U.S.C. § 16(a) (1964 ed.) (judgment or decree obtained by Goverment prima facie evidence against defendant in private action).

21. Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 85 S.Ct. 1473, decided May 24, 1965.

22. Id. at 1478.

23. See 4 Moore, Federal Practice ¶ 26.25 [5.-1] (2d ed., 1963).

24. See Overby v. United States Fid. & Guar. Co., 5 Cir.1958, 224 F.2d 158; 4 Moore, Federal Practice ¶ 26.25 [5.-1], at 1564 (2d ed., 1963).