Robert A. QUINN, Plaintiff, Appellant,

v.

MOBIL OIL COMPANY, etc., Defendant, Appellee.

No. 6737.

United States Court of Appeals
First Circuit.

Heard Sept. 13, 1966.

Decided March 31, 1967.

Aldrich, Chief Judge, dissented.

Robert A. Quinn pro se.

Conrad W. Oberdorfer, Boston, Mass., with whom Choate, Hall & Stewart, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In this action plaintiff, a gasoline station operator, charges the defendant oil company, his former lessor and supplier, with violations of the federal antitrust laws as a result of which he suffered great damage. The district court dismissed the suit for failure of the amended complaint to allege a federal antitrust law violation.

Viewing this ambiguous complaint in the light most favorable to the plaintiff,

the following facts will be taken as true. In November 1962 plaintiff leased a Mobil gasoline station from defendant for a period of one year—and entered into a contemporaneous retail dealer contract agreeing to purchase certain minimum quantities of defendant's petroleum products. The contract also provided for the purchase of tires, batteries and other accessories. This venture became fairly successful in the very first year of operation. In late 1963 when the lease and contract came up for renewal, defendant orally informed plaintiff that unless he reduced the retail price of gasoline by one cent a gallon his rent under the new lease would be substantially increased. Plaintiff flatly refused to reduce his price and vehemently protested the threatened rent increase. Apparently he won out—at least temporarily—because shortly thereafter the parties executed new agreements substantially the same as the old ones except for a slight increase in the rent.[1]

A few months later defendant began exerting various pressures on plaintiff to force him either to reduce his price of gasoline [2] or terminate his lease. It delayed payments due him at a time when it knew he needed the money; attempted to unload a consignment of tires, batteries and accessories on him [3] and apply the money owed in payment for this unwanted merchandise. After plaintiff refused to accept this consignment, defendant entered upon a campaign of harassment against him by delaying its deliveries of gasoline to his service station. Finally, when these pressures and harassments failed to bring about the desired results, defendant notified plaintiff in July, 1964 that it was terminating the lease as of the end of its current term (November, 1964). This, despite the fact that the receipts from the station had increased substantially in the relatively brief period he had operated it. Shortly, thereafter, plaintiff was required to vacate the gasoline station premises and as a consequence suffered great damage —all because of his refusal to comply with defendant's request that he reduce the retail price of its gasoline.

From these facts it is clear that the only provision of the federal antitrust laws that need be considered here is Section 1 of the Sherman Act, and I shall confine my discussion to defendant's alleged violation of that section.[4] Resale pricing agreements that unreasonably restrain trade or commerce, whether they fix minimum or maximum prices, are proscribed by Section 1 of the Sherman Act. Dr. Miles Medical Co. v. John D. Park & Son Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).[5] It should be pointed out, however, that in order to set forth a cause of action under this section [6] it is essential that a "contract, combination or conspiracy", express or implied, be alleged. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

1. These agreements ran automatically from year to year but were subject to termination in any year on notice of either party.

2. There is no allegation that defendant renewed its request for this price increase at this or any later time.

3. That he did not order; that defendant did not require his competitors to take and which under his contract plaintiff was not obliged to accept.

4. Plaintiff contends that defendant's above stated tactics also violated the Clayton Act as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(a) (b) (f) but this act is inapplicable under any view of the facts and for that reason we shall not consider this contention.

5. In this case the Court stated that both minimum and maximum price fixing agreements "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."

6. Section 1 reads in relevant part "Every contract, combination or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 26 Stat. 209, 15 U.S.C. § 1 (1964 ed.).

Beginning with United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895), the first case decided under the Sherman Act, and continuing down through United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), I have found no case where the Supreme Court has allowed recovery under this section absent a showing of at least one of these elements. Nowhere in his amended complaint has this plaintiff alleged the existence of any contract, combination or conspiracy between the defendant and others fixing the resale price of its gasoline nor does he allege any facts from which any such agreement, policy, scheme or conspiracy may be implied. Thus, I think the absence of such allegations renders the amended complaint fatally defective. Accord, House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2d Cir. 1962).

The allegation that defendant pressured plaintiff to reduce his retail price at best amounts to a unilateral attempt to coerce plaintiff into making such an agreement.[7] Therefore the immediate question is whether this is actionable under section 1 of the Sherman Act. I think not. If Congress intended to make attempts actionable under this section undoubtedly it would have done so expressly as it did in the very next section of the Act (15 U.S.C. § 2) dealing with monopolies. It certainly is not within our province to read into this section interstitially a proscription which Congress clearly did not intend.

There are three cases which it is argued tend to support the contrary view. I think these cases are distinguishable. The first is United States v. Parke, Davis & Co., supra. There the Court held that a manufacturer's conduct which went beyond a mere announcement of its price policy and a simple refusal to deal, violated Section 1 of the Sherman Act. In that case the manufacturer took steps to

pressure certain unwilling retailers into adhering to its resale price policy through the cooperation of its dealers and some of its retailers. The Court found that this joint action to maintain resale prices constituted a combination or conspiracy in restraint of trade. Although defendant's conduct in the case before us may have been more than a simple refusal to deal, our case is clearly distinguishable from *Parke, Davis* in that no combination or conspiracy is alleged nor can any be implied.

The facts in the other two cases, Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) and Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5th Cir. 1965), are practically identical. In both, a resale price agreement was entered into between supplier and dealer. Subsequently the dealer reneged and the supplier terminated the lease. Unlike the present case, in *Simpson* there was evidence of a large scale price maintenance program maintained through written consignment agreements under which the supplier fixed the retail price of gasoline. The dealer would not abide by the price fixed thereunder and for that reason the supplier refused to renew the dealer's lease. The Court held that resale price maintenance through this coercive type of consignment *agreement* violated Section 1 of the Sherman Act. The case turned on the existence of an agreement for resale price maintenance. *Simpson,* supra at 24. In the instant case there is no such agreement.

*Broussard,* supra involved a situation where the dealer reduced his retail price of gasoline only after repeated insistence by the supplier. Finding that he could not make a living at the reduced price, the dealer raised it to its former level. The supplier again insisted upon a reduction in price and when the dealer refused, the supplier declined to renew the lease. The record in that case is much stronger for the dealer than in the

7. A simple refusal to deal, standing alone, is not a vertical agreement; in fact the refusal indicates there has been a failure to obtain agreement. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 686 (1962).

instant one. In *Broussard* there was clear evidence that the supplier's insistence that the retail price be reduced was part of a "marketing program"; also that at least one other dealer had reduced his retail price due to this insistence. When the dealer in *Broussard* reduced his price an agreement to control the retail price came into existence. I think this was a determinative factor in that case, even though shortly thereafter the dealer refused to abide by it.[8] The evidence above mentioned also supplied the basis upon which a combination or conspiracy in restraint of trade could be implied.

■ Plaintiff Quinn never having complied with defendant Mobil's request to reduce his price, no agreement to control the resale price of gasoline ever came into existence between them. This, plus the absence of any allegation that Mobil's request was part of a general price maintenance scheme or policy or that any other dealer reduced his retail price as a result of defendant's insistence, clearly distinguishes our case from *Broussard*. To be actionable under Section 1 of the Sherman Act pressure to achieve retail price maintenance that exceeds a mere refusal to deal must occur "in a contemporaneous framework of the combination, conspiracy, or agreement forbidden by the statute." Dart Drug Corporation v. Parke, Davis & Company, 120 U.S.App.D.C. 79, 344 F.2d 173, 186 (1965). Clearly, in the instant case there is no such "framework."

■ The allegation that defendant terminated the lease, despite the fact that plaintiff's business had increased substantially, perhaps comes close to raising an inference that defendant was policing a general scheme to fix prices for the area. But this court should not be required to so speculate. Nor is it too much to require this plaintiff, absent the showing of an agreement, to allege enough facts to indicate that the acts complained of took place within the larger framework of a pricing program, policy or conspiracy—if this is the real basis of his complaint. He has not done so here.

Affirmed.

COFFIN, Circuit Judge (concurring).

I agree with Judge McEntee's conclusion that the absence of allegation of contract, combination, or conspiracy is a fatal defect in the complaint. But I would go further and say that even had plaintiff alleged either a completed agreement between himself and defendant or pressure on him to conform to a general maximum pricing policy of defendant, the complaint would not have stated a cause of action under section 1 of the Sherman Act.

My reasoning lies in the difference I see—admittedly without the benefit of authority—between the anti-competitive effects of minimum price fixing and of maximum price fixing, as practiced by a single manufacturer or supplier.[1] When a single manufacturer establishes and seeks to police a minimum resale price policy, he in effect is acting as the convenient instrumentality for his retailers. For the motive to maintain floors to prices is theirs, not his. It must be immaterial to the manufacturer

---

8. We do not subscribe to the view that an agreement broken shortly after it was made is in effect no agreement at all. See Guidry v. Continental Oil Company, 350 F.2d 342, 344 (5th Cir. 1965), where the same court, on the same day it decided *Broussard*, strongly emphasized this point.

1. To be sure, United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129, contains the classic statement, often repeated, that "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." But this was made in the context of industry-wide policies. As I shall hope to demonstrate, while maximum price fixing among manufacturers is more than likely to restrain price competition, the same cannot be said of maximum price fixing by one manufacturer acting truly independently.

what profit his retailers receive so long as they pay his price and sales are satisfactory. Therefore, what appears to be unilateral and vertical action by a manufacturer aimed toward retailers, may in reality amount to a horizontal agreement among retailer-competitors. The essence of combination is present although the mechanics may be obscure.

But in the case of a single manufacturer's policy to set ceilings above which resale prices shall not rise, the motive and the pressure must be, in the great generality of cases, the manufacturer's desire to maximize his profits. While it is of prime concern to a retailer that his competitor not undercut him, it is generally of no concern to him that his competitor cannot charge higher prices. It is, of course, important to him that he cannot raise his prices and increase his margin of profit. Whether, therefore, the retailer has his eye on his competitor or on himself, it is difficult to conceive of a situation in which retailers would pressure a supplier to put into effect a maximum price. In other words, unilateral maximum price pressure against retailers is not the equivalent of a horizontal combination, but rather of a series of vertical agreements for the manufacturer's benefit.

Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, which condemned agreement between two liquor manufacturers to fix maximum resale prices, gives indirect support to this proposition in two ways. First, its specific holding was that "an agreement among competitors, to fix maximum resale prices * * violate[s] the Sherman Act." 340 U.S. at 213, 71 S.Ct. at 260. Second, it rejected the argument that the two defendants, because of common ownership and control, were "mere instrumentalities of a single manufacturing-merchandising unit" and therefore could not conspire. The Court noted not only the separateness of the corporate entities but that they held themselves out as competitors. 340 U.S. at 215, 71 S.Ct. at 261. The strong implication, I think, is that

the same actions, if taken by a bona fide single unit, would not be proscribed by the Sherman Act.

Because of this reasoning, I do not agree with Broussard v. Socony Mobil Oil Co., 5 Cir., 1965, 350 F.2d 346. In that case a dealer's lease was not renewed, allegedly because of his refusal to acquiesce in his supplier's request to redue prices (i. e., to observe a maximum price ceiling). There was evidence of one other dealer's reducing his price, a "marketing program", and "suggestions of prices to [supplier's] dealers". The "program" was Socony Mobil's response to meet competition from a new gasoline in the area. While this evidence of pressure on more than one dealer, as Judge McEntee's opinion points out, distinguishes *Broussard* from the present case, it does not aid in reconciling the approach in *Broussard* to that which I find persuasive. For *Broussard* presented precisely the case of the "single manufacturing-merchandising unit" which *Kiefer-Stewart* took pains to distinguish. The court in *Broussard* cited the language of *Kiefer-Stewart* to the effect that "such agreements [among competitors to set maximum prices] no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." 350 F.2d at 349. But it ignored the fact that the referent of "such agreements" in that context was agreements *among competitors*. By so doing, I believe, it construed section 1 of the Sherman Act to elevate individual decision-making above competitiveness as a prime policy objective. *Kiefer-Stewart,* in my view, said only that interference with individualism achieved through an agreement among competitors to fix maximum prices was violative of the Sherman Act.

I readily accept the proposition that an agreement between two manufacturers to impose maximum prices on their dealers constitutes a combination in restraint of competition since (a) an identical or parallel system of maximum prices between two competing sets of

dealers is likely to become a system of minimum prices and (b) the motive of each manufacturer is likely to be something other than maximizing his own return. I am also in sympathy with the principle of unfettered decision-making by the retailer, but I do not think the Sherman Act goes any further than to proscribe shackles on such decision-making which are the result of (1) a combination which (2) restricts competition.

It is now pertinent to ask whether the above analysis is still valid in the light of Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98. It is possible to read *Simpson* as proscribing a price fixing agreement between a single supplier and a single retailer. In that case the oil company and a dealer had entered into a consignment agreement (coupled with a lease) under which the company set the retail price of gasoline. The dealer violated the agreement, selling below the authorized price to meet competition. Because of this, the oil company refused to renew plaintiff's lease. The Court held that resale price maintenance through such a consignment agreement was illegal. I would make two observations about *Simpson*. First, the Court faced the particular agreement between the parties against the background of use of the same lease-consignment device with some 3000 retailers in a "vast gasoline distribution system" in eight states. The Court characterized the arrangement as one which would "impose noncompetitive prices on thousands of persons whose prices might otherwise be competitive." 377 U.S. at 21, 84 S.Ct. at 1057. And, second, the agreement was one which set a specific authorized price, which prevented dealers from meeting competitive prices. Even if the data concerning the widespread use of the device could be considered irrelevant to the decision, I would not readily read *Simpson* as prohibiting a single-supplier—single-dealer maximum resale price agreement. This is because of the differences of critical significance between fixing a maximum and fixing a minimum, or, worse, a spe-

cific price. A minimum price agreement between one supplier and one dealer not only prevents him from meeting prices below that minimum but also is most unlikely to exist, absent pressure from other dealers to produce the end result of a horizontal combination. A maximum price agreement between one supplier and one dealer, on the other hand, not only leaves the dealer free to meet competitive prices but also is completely explicable in terms of the supplier's desire to maximize his return, without reference to any interest on the part of the dealer's or the supplier's competitors.

If, therefore, an agreement between a single manufacturer and a single dealer on a maximum price is not illegal, a frustrated effort to achieve such an agreement is not actionable, under the Sherman Act. Were such a completed agreement illegal, we would then confront a troublesome dilemma in dealing with unsuccessful efforts to obtain such an agreement. If we were to hold such conduct actionable, we would, as Judge McEntee notes, be adding judicially to section 1 the same kind of "attempt" provision which Congress has spelled out in section 2 dealing with monopoly. If we were to refrain from such judicial enlargement, we would create the anomalous situation of giving a treble damage remedy to a plaintiff, as in *Simpson*, who entered and then withdrew from an agreement, and denying such a remedy to a plaintiff who steadfastly resisted pressure to enter such an agreement in the first place. In my view, we embrace neither horn.

ALDRICH, Chief Judge (dissenting).

Both of the opinions of my brothers discuss the case of Broussard v. Socony Mobil Oil Co., 5 Cir., 1965, 350 F.2d 346, in which the court held that a claim that Mobil—also defendant here—attempted to set maximum prices for its retailers stated a claim of violation of section 1 of the Sherman Act. Judge McEntee finds the case distinguishable, while Judge Coffin finds it possibly in point, but

wrongly decided. Regretfully, I disagree with both.

## I.

In *Broussard,* as in the present case, Mobil suggested to the plaintiff, who was its lessee and at the same time one of its retailers, a maximum retail price for gasoline. Subsequently, when plaintiff refused to accept this maximum, Mobil exercised its contract right to terminate his lease. It is true that in *Broussard* there had been a price agreement with which the plaintiff at first complied, and that in the case at bar there was none. Broussard lost his lease because he refused to continue his undertaking; Quinn lost his because he refused to enter into one. The injury of which Broussard complained, however, did not arise out of the agreement, but out of the cancellation of his lease. I do not believe that if his cancellation was an act "forbidden in the antitrust laws," 15 U.S.C. § 15, Quinn's was not. In other words, I see no difference in substance between pressure to induce the making of an unlawful agreement and pressure to reinstate one that has been broken. To the extent that it be suggested that the rejected agreement in *Broussard* is what brought the case within the act, this would not only be an unfortunate distinction, since any future "Quinn" could establish rights for himself simply by making the requested agreement one day and breaking it the next, but also, it seems to me, an illogical one.

If, on the other hand, a distinction is to be sought in the fact that in *Broussard* there was an allegation that Mobil was engaging in a "marketing program" covering many dealers,[1] then I find myself in accord with Judge Coffin that such a program is not a horizontal conspiracy (as it might be in a minimum price situation) but a series of separate vertical agreements that are not in any collective interest of the retailers. There could be an implied horizontal combination where a manufacturer is enforcing minimum pricing, but no dealer wishes possible competitors to keep their prices down. Consequently I do not find in Mobil's general marketing program alleged in *Broussard*[2] any support for the allegation, if such be necessary, of an "agreement or combination."

## II.

Turning to Judge Coffin's views on *Broussard,* he asserts, first, that he does not find it to have been dictated by Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. In that case the Court held that a combination of two manufacturers to force a dealer to accept maximum resale prices violated section 1, and that the dealer could recover treble damages. The reasoning that led to this result seems important. The court of appeals had reversed the district court and denied recovery because it viewed section 1 as aimed at promoting competition and concluded, "Competition * * * does not rest upon the ability to charge a higher price than a competitor but upon the ability to meet the price or undersell that fixed by the competitor." 182 F.2d 228, 235. In reversing, the Supreme Court held that the Sherman Act is concerned not merely with competition in this limited, classical sense, but with the freedom and independence of the individual entrepreneur: "[Maximum price agreements] cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." 340 U.S. at 213, 71 S.Ct. at 260.[3]

1. Cf. Guidry v. Continental Oil Co., 5 Cir., 1965, 350 F.2d 342, 344.

2. I agree with my brethern that no such allegation can be found or inferred in Quinn's complaint, or should be supplied.

3. Cf. the language of Learned Hand, writing for the Second Circuit in United States v. Aluminum Co. of America, 1945, 148 F.2d 416, 427. "[In outlawing monopolies, Congress] was not necessarily actuated by economic motives alone. It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character,

It is true, as my brethren point out, that in *Kiefer-Stewart* the Court found a horizontal agreement between manufacturers to compel dealers to accept the stipulated maximum prices, while in the present case only a single manufacturer is involved. Since *Kiefer-Stewart* was decided, however, principles have developed that seem to me to make the presence of only one manufacturer, and the absence of any consummated agreement, irrelevant. In Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, plaintiff, a gasoline retailer, alleged that Union cancelled his lease for refusal to abide by an agreement to adhere to prices stipulated by Union. The Court held that he had stated a claim, noting again (see *Kiefer-Stewart,* supra) that the lease and agreement were allegedly being used "to injure interstate commerce by depriving independent dealers of the exercise of free judgment" in setting prices. *Simpson* thus seems to me to hold that a coercively extracted vertical agreement depriving a retailer of pricing discretion violates the act, and hence that where the requisite coercion to procure the vertical agreement is shown, a horizontal conspiracy such as that alleged in *Kiefer-Stewart* is unnecessary.

Nor does this result seem offensive. A free and independent dealer, as in United States v. Colgate & Co., 1918, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, may not be actionably wronged if a single manufacturer says to him, "Accept my conditions or I will not deal with you." Such a dealer is free to turn to other manufacturers, and may rely for his protection on competition among those manufacturers for his trade. A retailer who, like Quinn and Simpson, is also a lessee, is in a distinctly different position. The manufacturer's power as a landowner gives it leverage with which to interfere with the price discretion of others.[4]

Judge Coffin suggests, in response, a rather different interpretation of *Simpson.* He points out that *Simpson* involved the dictation of specific, rather than maximum prices, to numerous dealers rather than to one. He suggests that the unlawful "agreement" in *Simpson* was therefore not the vertical agreement between plaintiff and defendant but a horizontal combination of retailers with Union acting, apparently, as the hub of an illicit wheel. My difficulty with this is that it seems to run counter to what the opinion says.[5] The Court uses the word "agreement" invariably to refer to the vertical agreement between Simpson and Union. It refers to no other agreement, combination, or conspiracy except for similar vertical agreements with other dealers, and these are mentioned only for the purpose of showing that Union is

---

to one in which the great mass of those engaged must accept the direction of a few. These considerations, which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes." Compare Klor's, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741.

4. An interestingly comparable case is Northern Pacific Ry. v. United States, 1958, 356 U.S. 1, 28 S.Ct. 514, 2 L.Ed.2d 545. There the Court held that a vertical agreement between a railroad-landowner and a shipper-land purchaser, in which the purchaser agreed, in partial consideration for the sale of land, to "prefer" Northern Pacific over other carriers, violated section 1. Northern Pacific could not, the Court said, use one resource it possessed (land) to coerce its own customers in another market (shipping) in order to obtain an advantage over the railroad's own competitors. Here it is alleged that Mobile is using its land ownership to deprive one of its customers of price discretion, in order to gain an advantage over Mobil's own competitors through low dealer margins The agreements in *Northern Pacific* affected discretion to choose shippers rather than discretion to set prices, but the analogous structure of the two arrangements is suggestive.

5. See generally Note, "Combinations" in Restraint of Trade: A New Approach to Section 1 of the Sherman Act, 1966 Utah L.Rev. 75, 78–89. The note argues that *Simpson* does not fit within the traditional definition of conspiracy, and suggests that what happened in *Simpson* should be described, and proscribed, as a vertical combination (but not conspiracy) in restraint of trade.

in interstate commerce, and in order to refute the contention that the vertical agreements should be treated as lawful consignment agreements rather than unlawful price maintenance.

While I am not 100% certain, I do believe that *Kiefer-Stewart* and *Simpson,* taken together, proscribe coercively extracted vertical contracts to fix maximum prices, and that no distinction should be drawn between temporarily successful, as in *Broussard,* and totally unsuccessful coercive measures, as here, and accordingly I dissent.