David A. YENTSCH,
Plaintiff–Appellee–Cross–Appellant,

v.

TEXACO, INC.,
Defendant–Appellant–Cross–Appellee.

Nos. 698, 772, Dockets 79–7735, 79–7746.

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1980.
Decided May 12, 1980.

---

Alan Neigher, Bridgeport, Conn., for plaintiff–appellee–cross–appellant.

G. Kenneth Handley, White Plains, N.Y. (Milton J. Schubin, Randolph S. Sherman, Ira S. Sacks, New York City, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant–appellant–cross–appellee.

Before OAKES and VAN GRAAFEI-LAND, Circuit Judges, and NICKERSON, District Judge.*

OAKES, Circuit Judge:

This action, an anachronism in today's OPEC–pricing world, was brought against Texaco, Inc. by a former Connecticut service station dealer David Yentsch. Following a six–day trial in the United States District Court for the District of Connecticut, Judge Thomas F. Murphy submitted three issues to the jury: (1) whether Texaco

* Of the Eastern District of New York, sitting by designation.

coerced its Connecticut dealers, including Yentsch, to participate in an illegal maximum resale price maintenance scheme, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; (2) whether Texaco broke its contract with Yentsch by terminating his lease and dealer agreement; and (3) whether Texaco illegally tied S & H Green Stamps, Coca–Cola, and glassware products to the lease and dealer agreement, also in violation of 15 U.S.C. § 1.

The jury returned a single general verdict for $73,500 in favor of Yentsch, and the district court subsequently granted appellee's oral request for treble damages, pursuant to 15 U.S.C. § 15. In response to a Texaco motion, however, the court later vacated its trebling order since it had no way of knowing whether the jury found for Yentsch on antitrust or non–antitrust grounds, a situation which could have been avoided with the use of a special verdict, Fed.R.Civ.P. 49.

Texaco now appeals from denials by the district court of its motions for judgment notwithstanding the jury verdict and for a new trial. Yentsch cross–appeals from the district court's decision to vacate its original treble damages order. We reverse the judgment and remand for a new trial on the price–fixing claim.

### FACTS

David Yentsch leased and operated a Texaco service station in North Haven, Connecticut, from January 1, 1970 through December 31, 1971, when he was terminated by Texaco.[1] He signed a one–year lease and dealer agreement with Texaco in September, 1969, for the year 1970, and both parties renewed for 1971. The agreement could be terminated at the end of the annual lease term by either party upon thirty days' written notice.

During negotiations prior to the agreement, Texaco told Yentsch that it was dis-

satisfied with the prior dealer's sales volume and thought the station could increase sales if appellee remained open twenty–four hours a day, gave S & H Green Stamps to customers, participated in other Texaco promotions, and kept the station clean. Yentsch agreed, apparently on a trial basis, to offer Green Stamps and to maintain round–the–clock service.

Appellee stayed open twenty-four hours a day throughout 1970, except for Thanksgiving and Christmas, even though he thought it unprofitable to do so. Richard Ross, a Texaco sales supervisor from 1961 to 1968, testified that during 1967 and 1968, his district manager, Arthur Davis, told him "daily" to warn dealers that, unless they stayed open twenty–four hours each day, they would be terminated. Ross recounted that fifteen to twenty dealers were terminated by him on Davis's orders, because of their failure to maintain round–the–clock service. According to Ross, Davis himself threatened a dealer, in Ross's presence, with termination if he refused to stay open twenty–four hours.

Although Yentsch believed that increased gasoline sales resulting from offering Green Stamps did not cover their cost, he nevertheless distributed them during most of his two–year tenure. Texaco representatives threatened lease termination several times when he suggested dropping them. Donald Breitenstein, Texaco's sales representative for the North Haven area and Yentsch's representative from early 1970 through the spring of 1971, testified that he told his sales supervisor, Richard Hammer, about recalcitrant dealers who were unhappy with trading stamps, and Hammer "said that if they didn't do it, that, you know, Texaco could get someone who would do it and they wouldn't be there when lease time came around again." Ross noted that Texaco generally told dealers during the late 1960s that a condition of keeping their stations would be their giving away trading stamps.

---

1. Texaco claims that Yentsch was not terminated, since he voluntarily signed a "mutual cancellation" agreement. By signing the agreement, Yentsch received a promise from Texaco that it would buy back his inventory and settle all accounts within 60 days. Since the record makes it clear that Texaco intended to end its relationship with Yentsch whether he consented or not, he had nothing to lose and a little to gain by making the "termination" mutual.

Texaco also urged appellee to participate in glassware and Coca–Cola promotional programs, which he grudgingly did after threats that his lease would otherwise not be renewed. Breitenstein testified that Texaco kept forms indicating whether a dealer did or did not participate in the two promotions. Hammer told him that he wanted all retailers to join the promotions.

Another major area of contention between Yentsch and Texaco was pricing policy. Texaco offered a "temporary voluntary allowance" (TVA) to its dealers during times of price instability–popularly known as "price wars"–reducing its wholesale dealer tankwagon prices by, for example, 2.1 cents per gallon. The dealer was expected to make a further .9 cent or 30 percent reduction, resulting in an overall pump price decrease of three cents. Yentsch, mistakenly under the impression that Texaco would cover the full three cent reduction, followed this program for a short time in early 1970, until he learned that he, too, was contributing to the lower price. He testified that even then, "I left [the price at that level] for a while, and I realized I didn't have enough of a margin on the gasoline to be dropping a cent, so I went back up one cent to meet the two cents that they were giving me." He later decided generally to reduce his retail price only by the amount of the Texaco allowance, although he noted that "[a]t times I did" lower the "price an additional 30 percent" over the allowance late in 1970.

Texaco, however, wanted Yentsch to contribute his own price reductions as part of its TVA program. It thought that Yentsch priced his gasoline too high for the market, at least one or two cents higher than his competitors. Yentsch testified that sales supervisor Hammer told appellee at least ten times during 1971: "[E]ither drop the price or we are going to get a replacement for you." When asked during direct examination whether he complied with Hammer's threats, appellee answered "[n]ot every time" and "[v]ery seldom." He testified

that he recalled dropping his price the extra 30 percent only once in 1971, during the summer. Yentsch stated in a deposition that Hammer "convinced me to participate in the pricing and it would increase my volume so much that I would be making more money. I tried it for a couple of weeks and it didn't work out."

Breitenstein testified that "Mr. Hammer would want me to tell the dealers to lower their prices so they would pump more gallonage," and that Hammer told him to tell dealers "[t]hat if their gallonage wasn't up to what Texaco wanted it to, they could find somebody else to run the station that could get it up there." Breitenstein had monthly discussions on this topic with Hammer and had previously talked on the same topic every six weeks or so with Hammer's predecessor, Henry Milton, Texaco's sales supervisor from 1969 to 1970.

After reviewing projections estimating a 10,000 gallon decrease in sales for Breitenstein's area during the month of May, Hammer handwrote him a memorandum on April 3, 1971, stating:

> I expect you to do everything possible to have this in the *Black* by 5–31–71. Prices, Coca–Rama, and hours of operation must be utilized. I told H. C. Milton today Yentsch is off 24 hours and he and I agree. Get a replacement retailer. We are both upset that you didn't come to us for help *before* he went off. I want an S–202 [termination form] drawn up on Yentsch, bring it to me *this week*, and then discuss with me.

Ross testified that district manager Davis would "ride the area" and survey dealer prices, in order to determine whether dealers were reducing prices according to the TVA. He also commented that "the dealers were really informed [during training] that in order to be very competitive they had to follow the tank wagon pricing."

Although Texaco renewed Yentsch's lease and dealer agreement for 1971, it grew increasingly dissatisfied with him.[2] Finally,

**2.** In addition to the dispute over prices, hours of operation, promotional programs, and volume of gasoline sold, the appearance of the station became an issue. Texaco claims that

in late November, 1971, it informed him that the lease would be terminated as of December 31, 1971. Yentsch signed a "mutual cancellation" agreement with Texaco, *see* note 1 *supra*, and later rejected its offer of a month–to–month extension of his lease and dealer agreement.

## DISCUSSION

### A. *Price–Fixing Claim*

█ Vertical resale price maintenance is, so far as still appears, per se illegal under § 1 of the Sherman Act. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 942, 63 L.Ed.2d 233 (1980); *Albrecht v. Herald Co.,* 390 U.S. 145, 151, 88 S.Ct. 869, 872, 19 L.Ed.2d 998 (1968).[3] The Supreme Court originally made this position clear in *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), when it proscribed written contracts between the manufacturer and dealers fixing retail prices. *Id.* at 407–08, 31 S.Ct. at 384–85. Eight years later, the Court, in *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), backtracked to some extent:

In the absence of any purpose to create or maintain a monopoly, the [Sherman] [A]ct does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to

exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*Id.* at 307, 39 S.Ct. at 468. The Court noted that the indictment did not charge Colgate "with selling its products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company," *id.,* whereas in *Dr. Miles,* "the unlawful combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell [their own goods]," *United States v. Colgate & Co., supra,* 250 U.S. at 307–08, 39 S.Ct. at 468.

Since the advent of *Colgate,* both the Court and commentators have been grappling to recast or limit its reach. *See* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 684–85, 687–88 (1962) (discussing cases); Pitofsky, in Pitofsky & Dam, *Is the Colgate Doctrine Dead,* 37 ABA Antitrust L.J. 772 (1968) (yes it is); Maslow, *Colgate Updated: Resale Price Maintenance and Antitrust Liability,* 48 N.Y.St.B.J. 626 (1978) (*Colgate* not dead). The *Dr. Miles* "contract" element was enlarged to include agreements "implied from a course of dealing." *United*

---

Yentsch failed, for example, to keep the men's room clean and the toilet in running order. Yentsch responds that he had continuous problems with the plumbing and repeatedly asked Texaco to make the repairs, as it was required as landlord to do.

**3.** Section 1 of the Sherman Act states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ..

15 U.S.C. § 1.

We need not enter the debate over whether maximum resale price maintenance should be treated differently from minimum resale price maintenance, since both are presently considered illegal per se. *Albrecht v. Herald Co., supra,* 390 U.S. at 152–53, 88 S.Ct. at 873–74. *But cf. Albrecht, supra,* at 156–59, 88 S.Ct. at 875–77 (Harlan, J., dissenting) (arguing for distinction); *Quinn v. Mobil Oil Co.,* 375 F.2d 273,

276–77 (1st Cir.), *cert. dismissed,* 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967) (Coffin, J., concurring) (arguing for distinction); P. Areeda & D. Turner, 3 *Antitrust Law: An Analysis of Antitrust Principles and their Application,* § 734e, at 263–64 (arguing for distinction). *Compare* Pitofsky, *The Sylvania Case: Antitrust Analysis of Non–Price Vertical Restrictions,* 78 Colum.L.Rev. 1, 16 n. 59 (1978) (suggesting that *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), applying rule of reason to geographical restrictions may augur demise of per se analysis of maximum price–fixing under *Albrecht*) *with Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 ("The *per se* illegality of *price* restrictions has been established firmly for many years and involves significantly different questions of analysis and policy." (emphasis added)).

*States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 99, 40 S.Ct. 251, 64 L.Ed. 471 (1920). The *Colgate* refusal-to-deal notion was narrowly construed in *FTC v. Beech–Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), where the Court found that Beech–Nut's announced pricing policy, accompanied by threats of termination, active surveillance of prices, and reinstatement conditioned on assurances of price maintenance, fell outside the protection of *Colgate. See also United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944).

More recently, the Court, in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), fleshing out what might be termed a *"Colgate* plus" doctrine, held that

> an unlawful combination is not just such as arises from a price maintenance *agreement,* express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

*Id.* at 43, 80 S.Ct. at 511 (emphasis in original).[4] The required combination must be demonstrated, then, by proof of (1) an express or implied agreement, or (2) the securing of actual adherence to prices by means beyond mere refusal to deal. *See also Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964) ("[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance."). In addition, the Court, in *Al-*

*brecht v. Herald Co., supra,* suggested several different formulations of combinations:

> Under *Parke, Davis* petitioner could have claimed a combination between respondent and himself, at least as of the day he unwillingly complied with respondent's advertised price. Likewise, he might successfully have claimed that respondent had combined with other carriers because the firmly enforced price policy applied to all carriers, most of whom acquiesced in it.

390 U.S. at 150 n.6, 88 S.Ct. at 872 (citation omitted). *See* Pitofsky and Dam, *supra,* at 787 (describing the *Albrecht* footnote as "pleading hints to prospective plaintiffs"). Thus, Yentsch might satisfy the hypotheticals in *Albrecht* by proving either that *he* complied with Texaco's price policy, or that the price policy (1) was firmly enforced, (2) applied to all service station dealers, and (3) was acquiesced in by most of them. Taken together, then, *Parke, Davis* and *Albrecht* stand for the basic proposition that use of coercion that achieves actual price–fixing is illegal.

▆▆▆▆ In determining whether the above standards were met in the instant case, we must, of course, sustain the jury's verdict if there was substantial evidence, taking the view most favorable to appellee, to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We think there was sufficient evidence here, although just barely, to find an illegal combination to maintain resale prices[5] between Texaco and other Connecticut service station dealers, and between Texaco and

---

**4.** Justice Harlan, in dissent, thought that the majority opinion had in effect overruled *Colgate* without so stating, 362 U.S. at 49, 80 S.Ct. at 514 (Harlan, J., dissenting), although he later largely retracted this critical view, *Albrecht v. Herald Co., supra* 390 U.S. at 163 n. 7, 88 S.Ct. at 879 n. 7, (Harlan, J., dissenting).

**5.** Justice Harlan posited that "there is no 'combination' when a manufacturer simply states a resale price and announces that he will not deal with those who depart from it; there is a combination when the manufacturer goes one inch further." *Albrecht v. Herald Co. supra,* 390 U.S. at 163, 88 S.Ct. at 879 (Harlan, J., dissenting). One commentator has suggested that the

very facts in the original *Colgate* opinion would no longer be protected under the modern version of the *Colgate* doctrine. Maslow, *Colgate Updated: Resale Price Maintenance and Antitrust Liability,* 48 N.Y.St.B.J. 626, 638 (1978). Others have counseled companies about the risks inherent in relying on a *Colgate* pricing program. L. Sullivan, *Handbook of the Law of Antitrust* § 139, at 395 (1977) (likening *Colgate* defense to a "small sheet to windward" but *useless as a planning device);* Hally, *Antitrust Restraints on Pricing Communications to Dealers,* ALI–ABA Course Materials, J., Aug. 1978, at 35–51 (outline of circuit court case law).

Yentsch.[6] Texaco went beyond *Colgate's* safe harbor of announcement plus mere refusal to deal by creating a coercive business climate in which its dealers knew of the low price policy, understood the consequences of failure to comply and thus generally complied.

Appellant warns that if the § 1 requirement of proof of concerted action, *i. e.*, "contract, combination . . . or conspiracy," is to remain viable, "plaintiff's 'inference' theory must be rejected." Reply Brief of Appellant at 9. While Yentsch's case is surely not a strong one, by carefully considering the totality of evidence at trial relating to discussions among Texaco's employees, Hammer's memorandum, and Texaco's dealings with Yentsch, a jury could reasonably infer the existence of an illegal price–fixing combination.[7]

Texaco's threats of termination to enforce its price policy were sufficient to satisfy the *Parke, Davis–Albrecht* standards of "means beyond mere refusal to deal" and "firm enforcement." Sales representative Breitenstein recounted that his supervisor Hammer wanted him to tell Texaco dealers to lower their gas prices, in order to produce greater volume sales. Hammer also advised him that if volume did not increase, dealers were to be threatened with termination. His memorandum to Breitenstein exhorted: "I expect you to do everything to have this in the *Black* by 5–31–71 [emphasis in original]. *Prices, Coca–Rama, and hours of operation must be utilized* [emphasis added]."

■ Although it would have been far preferable for Yentsch to have presented direct evidence, such as testimony from *other* dealers, proving that Texaco *actually* threatened or terminated dealers besides Yentsch over prices, a jury would nevertheless be able to infer from the in–house Texaco discussions and the memorandum that such threats to dealers were made.[8] Yentsch himself testified that Hammer told him at least ten times to "drop the price" or risk replacement. While evidence of exposition, persuasion, argument, or pressure is alone insufficient to establish coercion, *see Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140–43 (9th Cir.), *cert. denied* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974) (retailer's independent pricing discretion maintained); *Gray v. Shell Oil Co.*, 469 F.2d 742, 748 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973) (coercion versus exposition, persuasion, argument), threats of termination, as long as they secure adherence to the fixed price, have been deemed to trespass beyond the boundaries of *Colgate*, thereby triggering a finding of an illegal combination. *Albrecht v. Herald Co.*, *supra*, 390 U.S. at 149, 88 S.Ct. at 871 ("The combination with retailers [in *Parke, Davis*] arose because their acquiescence in the suggested prices was secured by threats of termination . . ."). *See Bowen v. New York News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1975) ("[A] manufacturer . . . may not enforce his announced resale prices by active coercion of those who purchase for resale, such as

6. A review of cases from other circuits leads one to conclude that the character of the instant interaction between Yentsch, Texaco, and its other Connecticut dealers is, or in the petroleum products business was, by no means unique. *See, e. g., Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Umphres v. Shell Oil Co.*, 512 F.2d 420 (5th Cir.), *cert. denied*, 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Quinn v. Mobil Oil Co.*, 375 F.2d 273 (1st Cir.), *cert. dismissed*, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967); *Broussard v. Socony Mobil*

*Oil Co.*, 350 F.2d 346 (5th Cir. 1965); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1964).

7. One might argue that forcing dealers to pass out trading stamps is a form of illegal price fixing, since the stamps operate as a *de facto* price discount for customers. Since the evidence on the chief price fixing claim is sufficient, however, we need not consider this issue.

8. We do note in passing that, in the original posture of this case, eight other former Texaco dealers along with Yentsch filed suit. The district court granted Texaco's motion for severance of each of the named plaintiffs.

through threats of termination for noncompliance, whether made in combination with others . . . or alone . . . .") (citations omitted); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 32–33 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Phillips v. Crown Central Petroleum Corp.*, 395 F.Supp. 735, 760–61 (D. Md. 1975), *vacated and remanded on other grounds*, 556 F.2d 702 (4th Cir. 1977). Thus, such threats were also adequate proof of firm enforcement. *See United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372, 87 S.Ct. 1856, 1862, 18 L.Ed.2d 1249 (1967) ("firmness" grounded upon communicated danger of termination), *overruled on other grounds, Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977); *Simpson v. Union Oil Co.*, *supra*, 377 U.S. at 17, 84 S.Ct. at 1054; *Janel Sales Corp. v. Lanvin Parfums, Inc.*, 396 F.2d 398, 406–07 (2d Cir.), *cert. denied*, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). The coercive atmosphere may have been enhanced by a policy of price surveillance. Ross, the sales supervisor in the 1960s, testified that district manager Davis would survey dealer's stations to determine their prices, a tactic condemned as part of an illegal resale price maintenance scheme in *FTC v. Beech–Nut Packing Co.*, *supra*, 257 U.S. at 446, 449–50, 42 S.Ct. at 151, 153.

■ The evidence also supported a finding of actual adherence to prices, as required under the *Parke, Davis–Albrecht* formula. There was every reason to believe that Texaco's pricing policy applied to all Connecticut dealers; indeed, the TVA program itself was designed to include each service station. The jury could properly draw the inference that most Texaco dealers actually adopted lower prices. Other Texaco stations in Yentsch's area had lower prices than his. Widespread use of the TVA would alone result in lower prices.[9] Appellee *himself* lowered his pump prices on at least three occasions. Although his reason for doing so one of the times was his own confusion over operation of the TVA program, another of his decreases was apparently in response to Hammer's threats of termination and general efforts to enforce Texaco's pricing policy.[10] This coerced "agreement" with Texaco alone was sufficient to violate § 1 of the Sherman Act.[11] *See Albrecht v. Herald Co.*, *supra*, 390 U.S. at 150 n.6, 88 S.Ct. at 872 n.6;

9. There was some evidence that dealers were told that they were expected to follow tank wagon pricing (wholesaler dealer pricing) as part of the TVA program. But is was insufficient to show that availability of the TVA was expressly conditioned upon a dealer's corresponding price reduction, or that the allowance would be withdrawn without such compliance. *Compare Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1356 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (because TVA was initiated by dealers, *i. e.*, "not initiated by Shell to force dealers to fix prices," it was not illegal price–fixing), *with Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 32–33, 41 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972) (withdrawal of TVA because dealer refused to lower price is improper).

10. Texaco asserts that "plaintiff acknowledges that he did not comply with Texaco's alleged pricing demands" and "[t]hat admission establishes that there was no conspiracy between plaintiff and Texaco." Reply Brief of Appellant at 3. We find no such admission by Yentsch in his brief or in the record. There is some conflict in Yentsch's testimony about how often and when he lowered his prices. At one point, he seemed to indicate that the only time he dropped prices other than the first few months of 1970 was in May 1970. However, he also twice testified at trial and once in a deposition that he decreased prices in 1971 at Hammer's request. Although appellee commented that Hammer "*convinced* me to participate in the pricing" (emphasis added), it seems clear that such convincing included threats of finding a replacement dealer if compliance was not forthcoming. Thus, his testimony indicated that he did at least three times lower his price in compliance with Texaco's pricing policy, once unwittingly (when he thought his allowance would be three cents and he would not have to contribute), once voluntarily (when he knew he would have to contribute), and once in response to Hammer.

11. Texaco argues that *Quinn v. Mobil Oil Co.*, 375 F.2d 273 (1st Cir.), *cert. dismissed*, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967), supports its conduct as permissible. In *Quinn*, Mobil threatened to increase its rent in an upcoming renewal of a station operator's lease, unless he reduced prices, but the dealer refused. Several months later, Mobil threatened lease termination, delayed payments needed by the dealer as

*United States v. Parke, Davis & Co., supra,* 362 U.S. at 45 n.6, 80 S.Ct. at 512 n.6. That Yentsch, after finding that his lowered price provided an insufficient profit margin, subsequently raised his price and generally thereafter maintained it at the higher level, does not insulate Texaco's behavior. *See Broussard v. Socony Mobil Oil Co.,* 350 F.2d 346, 348–50 (5th Cir. 1965). Furthermore, Yentsch was terminated by Texaco, arguably in part because of his refusal most of the time to comply with pricing demands.[12] *See Lessig v. Tidewater Oil Co.* 327 F.2d 459, 464 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (actual termination enough to constitute illegal behavior).

## B. *Breach of Contract Claim*

 Count IV of appellee's amended complaint alleged a "breach of contract and

well as gasoline shipments, attempted to unload a consignment of tires, batteries, and accessories in lieu of payments owed, and otherwise harassed the dealer. The supplier eventually terminated the dealer for failure to reduce his prices.
Judge McEntee's opinion said:
The allegation that defendant pressured plaintiff to reduce his retail price at best amounts to a unilateral attempt to coerce plaintiff into making such an agreement. Therefore the immediate question is whether this is actionable under section 1 of the Sherman Act. I think not. If Congress intended to make attempts actionable under this section undoubtedly it would have done so expressly as it did in the very next section of the Act (15 U.S.C. § 2) dealing with monopolies.
*Id.* at 275. The court viewed the dealer's failure to agree to reduce his prices as dispositive, presaging the Supreme Court's statement in *Albrecht v. Herald Co., supra,* 390 U.S. at 150 n. 6, 88 S.Ct. at 872 (suggesting a combination was formed between the newspaper company and the independent carrier "at least as of the day he unwillingly complied with [the newspaper company's] advertised price"). Here, Yentsch did lower his price, not counting the *unintentional* reduction, thereby signalling agreement. Furthermore, in *Quinn,* there was no evidence of any Mobil policy or action toward other dealers, whereas the evidence in the instant case portrayed–although vaguely–a general Texaco policy directed at its Connecticut dealers.
The *Quinn* case promotes an interesting dichotomy between attempted and successful coercion. Judge Coffin, specially concurring,

. . . breach of fiduciary relationship with the plaintiffs"[13] by Texaco. The complaint cited implied representations made by Texaco that the lease and dealer agreements would be automatically renewed as long as plaintiffs paid their bills, operated their stations primarily for the sale of gasoline and automotive products, maintained a clean station, purchased a designated amount of Texaco products, and otherwise complied with the terms of the express written agreements. ¶ 30 of Plaintiffs' Amended Complaint. Paragraphs 31(a), (c), and (d) alleged other Texaco promises which Yentsch relied upon and which were presumable not fulfilled.

Appellee argues nevertheless that "[t]he breach of contract–fiduciary obligation claims were effectively removed from the jury's consideration." Brief of Appellee at

discussed the apparent anomaly of rewarding the plaintiff who agrees to fix prices while denying reward to one who "steadfastly resist[s] pressure to enter such an agreement." 375 F.2d at 278. Justice Harlan echoed this sentiment: "Obviously it makes no sense to deny recovery to a pressured retailer who resists temptation to the last and grant it to one who momentarily yields but is restored to virtue by the vision of treble damages." *Albrecht v. Herald Co., supra,* 390 U.S. at 162, 88 S.Ct. at 878 (Harlan J., dissenting). Judge Aldrich, dissenting in *Quinn,* would not draw any distinction between successful and unsuccessful coercion. 375 F.2d at 281 (Aldrich, J., dissenting). Justice Harlan's dissent in *Albrecht* puts a damper on reading the majority's "*at least* as of the day" (emphasis added) language as suggesting the possibility that an attempt might be sufficient. Therefore, while we see arguments pro and con for differentiating attempts from actual compliance, we believe existing law demands such a distinction.

12. There was evidence in the record that, over a three-year period, 75% of Texaco's service stations changed hands. The direct proof did not indicate whether the turnover rate was fueled by threats of termination or actual terminations. However, we presume that hard news or rumors of terminations, resulting from noncompliance with Texaco's pricing policy, would in and of itself have a coercive effect on dealers' pricing independence.

13. The amended complaint was filed on February 10, 1976 by the original nine Texaco service stations dealers, including Yentsch.

24. We disagree and find that submission of the claim to the jury constituted reversible error.[14] The district court charged the jury as follows:

> As I told you earlier, Plaintiff has another theory of liability other than the alleged violation of antitrust laws. It is his claim, as I said, that Texaco breached the contract and fiduciary relationship with him by not renewing his lease and contract claims, that such written agreements would be automatically renewed as long as Plaintiff paid his bills, et cetera.
>
> In order for Plaintiff to succeed on this claim, he must prove by a preponderance of the evidence that his agreement with Texaco made these promises, and that the promises were broken by Texaco. In order for you to ascertain that these promises, if they were made, you must find them in the written agreement. You are not allowed to imply the promises. The written agreements control exclusively.

Thus, while the judge narrowed the issue by eliminating jury consideration of implied promises, he nevertheless submitted a contract claim based on the written agreements.

Moreover, the jury itself indicated its interest in the breach of contract claim by sending two notes to the district judge during its deliberations. In the first, after mentioning some of the minimum and maximum gasoline volume figures in the lease and dealer agreement, the jury asked, "Question, is this a breach of the agreement, and by whom?" In response to the judge's request for clarification of what it meant by this note, the jury recast its question:

> Is Texaco restricting the number of gallons of gasoline that they, Texaco, will sell to Mr. Yentsch per year by stating maximum numbers of gasoline in the sales agreement? . . . In 1970 and '71 Mr. Yentsch purchased amounts of gasoline in excess of the maximums

contained in the sales agreement. Does the purchase of Texaco gasoline by Mr. Yentsch in amounts in excess of those amounts stated in the sales agreement constitute a breach of contract by either party?

The breach of contract claim never should have gone to the jury in the first instance, since there was no evidence to support it. *See Gehrhardt v. General Motors Corp.*, 581 F.2d 7, 14 (2d Cir. 1978). There were no allegations that Texaco had failed to live up to the *written* terms of the lease and dealer agreement. The contract clearly provided that

> [e]ither party may terminate this agreement on the last mentioned date or any succeeding anniversary thereof by giving written notice to the other at least thirty days prior to the date upon which termination shall become effective.

Texaco fully complied with this unconditional mutual cancellation provision, by notifying Yentsch in November, 1971 of its desires. Since the district court had already removed implied breach of oral promises and fiduciary relationship claims from consideration, the jury was left to ponder issues clearly disposed of on the face of the contract.

### C. *Illegal Tying Claim*

Yentsch's third claim was that Texaco illegally tied S & H Green Stamps, Coca–Cola, and glassware promotions to its lease and dealer agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The law of tying requires proof of five specific elements: first, a tying and a tied product, *Coniglio v. Highwood Services,*

---

14. Judge Murphy also thought he had submitted a breach of contract claim to the jury upon which it may have based its decision. Although he initially granted Yentsch's motion for treble damages, he subsequently vacated the trebling order, apparently on the rationale that one could not be sure whether the jury had decided the case on antitrust or non–antitrust grounds.

*Inc.*, 495 F.2d 1286, 1289 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); second, evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product, *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 661–62 (2d Cir. 1974); *American Manufacturers Mutual Insurance Co. v. American Broadcasting–Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product, *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977) (*Fortner II*); fourth, anticompetitive effects in the tied market, *Northern Pacific Railway Co. v. United States, supra*, 356 U.S. at 6, 78 S.Ct. at 518; *Coniglio v. Highwood Services, Inc., supra*, 495 F.2d at 1289; and fifth, involvement of a "not insubstantial" amount of interstate commerce in the tied product market, *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969) (*Fortner I*); *United States v. Loew's, Inc.*, 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962); *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).[15]

▆ The first two elements of an illegal tying arrangement were present here. The tying product was the lease and dealer agreement; the tied products were S & H Green Stamps, Coca–Cola, and glassware. Furthermore, the evidence supported a finding that Yentsch and probably other dealers were successfully coerced by Texaco into buying the tied products, at least as to the stamps. Sales representative Breitenstein testified that his supervisor Hammer stated that dealers who refused trading stamps "wouldn't be there when lease time came around again." Supervisor Ross testified that distribution of trading stamps was a condition of keeping a station in the late 1960s. Yentsch himself was threatened with lease termination when he suggested dropping the stamps. Proof is weaker on whether the Coca–Cola and glassware promotions were successfully tied. Hammer did tell Breitenstein that he wanted all retailers to join in the promotions, and Texaco kept forms on dealers indicating their participation or nonparticipation. But the only direct proof of coercive tactics related to Yentsch, who stated he accepted the items only after threats of termination.

Evidence going to the last two elements of illegal tying forces us into a posture of conjecturing possibilities. As to anticompetitive effects in the tied product markets, the question is whether trading stamp, soft drink, or glassware competitors were foreclosed from selling to Yentsch and other Connecticut dealers because of Texaco's policies. Appellee suggests that the jury could infer such impact from the persuasiveness of the coercive tying policy and the very fact of Texaco's 400 Connecticut and 40,000 overall service stations. Appellant counters that Yentsch never claimed that, absent the alleged tying, he would have purchased products from other trading stamp, soft drink, or glassware suppliers, such as, for example, Blue Chip Stamps or Seven–Up. In fact, Yentsch testified that he would not have bought any promotional products at all. Furthermore, he adduced no direct evidence that other service station dealers wanted to purchase other products in the tied markets. If the jury were to infer general behavior from that of Yentsch, as he asked it to do for the price–fixing claim,

---

**15.** Appellant urges us to adopt a sixth test for determining an illegal tying, namely whether the seller of the tying product has a direct economic interest in the market for the tied product. We see considerable logic for using such a criterion, and other circuits have already applied it, *see Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 456 (5th Cir. 1979); *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1317–18 (3d Cir. 1975); *Crawford Transport Co. v. Chrysler Corp.*, 338 F.2d 934, 938–39 (6th Cir. 1964), *cert. denied*, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965). Nevertheless, we do not decide today whether to incorporate this element into our tying analysis, since appellee's claim fails on another ground.

it could only assume that other dealers would similarly decline to substitute different items.

Even to the extent that appellee need not establish an exact percentage of foreclosure in the tied product and that "it is unreasonable, *per se*, to foreclose competitors from any substantial market," *International Salt Co. v. United States, supra*, 332 U.S. at 396, 68 S.Ct. at 15; *see Ohio–Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267 (1979), appellee has skirted perilously close to failing to demonstrate any foreclose at all. We require at least some showing that the illegal tying arrangement results in actual foreclosure of competition in the tied product market. *See Coniglio v. Highwood Services, Inc., supra*, 495 F.2d at 1291–92 (where defendant's monopoly in the tied product prevented actual foreclosure of competition).

Proof relating to the fifth element is also speculative. Yentsch spent $7,487.50 for stamps in 1970, and $7,037.50 in 1971, $294 for Coca–Cola and $558 for bottle deposits, and $150 for glassware. Although Yentsch urges that his own $15,000 total is sufficient to meet the test of quantitative substantiality, we are not convinced that this amount alone is "substantial enough . . . so as not to be merely *de minimis*." *Fortner I, supra*, 394 U.S. at 501, 89 S.Ct. at 1258. In *Fortner I*, the Court found $200,000 sufficiently substantial. *Id.* at 502, 89 S.Ct. at 1258. *See also United States v. Loew's Inc., supra*, 371 U.S. at 49, 83 S.Ct. at 104 (payments ranging from $60,800 to over $2,500,-000 were substantial); *Detroit City Dairy, Inc. v. Kowalski Sausage Co.*, 393 F.Supp. 453, 472 (E.D. Mich. 1975) ($86,376.72 not insubstantial).

This conclusion does not halt the inquiry, however. The Court has counseled that, [f]or purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice . . . the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit. *Fortner I, supra* 394 U.S. at 502, 89 S.Ct. at 1258. Here, Yentsch presented no specific evidence on dollar amounts of purchases by other dealers, but instead asked the jury to extrapolate such numbers by multiplying his own figures by some or all of the 400 Connecticut and 40,000 nationwide Texaco dealers. The evidence at least suggested that some Connecticut dealers also participated in the promotions, so that undoubtedly more than Yentsch's $15,000 was involved. Even if only 10% of the dealers purchased an amount of tied products equal to that purchased by Yentsch, about $600,-000 of commerce would be involved, clearly meeting any test of substantiality.

 Whether or not the evidence was sufficient to satisfy these last two elements, however, appellee failed to prove the third element: sufficient *economic power* in the tying product market. *Fortner II, supra*, provides the relevant standard: "[T]he question is whether the seller has some advantage not shared by his competitors in the market for the tying product." 429 U.S. at 620, 97 S.Ct. at 867. Without such advantage, the Court reasoned, "the seller's product does not have the kind of uniqueness considered relevant in prior tying–clause cases." *Id.* at 620–21, 97 S.Ct. at 868. The Court suggested that evidence of some cost advantage over competitors in the tying market, or the offering of a tying product significantly differentiated from that which competitors could offer, would suffice in demonstrating adequate economic power.[16] The simple fact of a company's largeness or enormous financial resources is inadequate.

 Yentsch has not met his burden here. He failed to show that Texaco's competitors in the tying market, *i. e.*, other

---

**16.** One commentator has criticized *Fortner II*, on the ground that a company's own efficiency and enterprise resulting in a cost advantage over other competitors should not be adequate to prove sufficient economic power. *See* Jones, *The Two Faces of* Fortner: *Comment on a Recent Antitrust Opinion*, 78 Colum.L.Rev. 39, 45 (1978).

gasoline suppliers, operated under some disadvantage in the Connecticut service station market. There was no evidence that Texaco dominated the regional market, owned the best sites, had a special deal on crude oil, petroleum products, or related supplies unavailable to other companies, or otherwise enjoyed a special position creating sufficient economic power in the tying market to impose illegal tying. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 453–54 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (plaintiffs might prove economic power if defendants controlled majority of stations, or zoning and high capital costs restricted potential new service station entrants).[17]

## DISPOSITION

▉ The breach of contract and illegal tying claims should not have been submitted to the jury, in that both were insufficiently supported by the evidence. Since the jury returned a single general verdict in favor of appellee, and "there is no way to know that [either of] the invalid claim[s] . . . was not the sole basis for the verdict," a new trial is required. *United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959). *See Morrissey v. National Maritime Union*, 544 F.2d 19, 26–27 (2d Cir. 1976).[18] Yentsch urges that we can nevertheless affirm the judgment below if we are "fairly convinced that the jury proceeded only on the sound ground." *Id.* at 27; *see Collum v. Butler*, 421 F.2d 1257, 1260 (7th Cir. 1970); *Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 837–38 (2d Cir. 1967). We have no confidence, however, that the jury based its decision exclusively on the price–fixing claim, the only one sufficiently supported by the evidence to warrant submission.

▉ We therefore reverse and remand for a new trial solely on Yentsch's illegal resale price maintenance claim against Texaco.[19]

17. The district court's charge to the jury on what constitutes an illegal tying arrangement was inadequate. The judge charged as follows:

So, turning to the other three tie–ins involving glassware, Coca–Cola and Green Stamps, to prevail on any one of these claims, Plaintiff must prove each of the following elements by a preponderance of the evidence. One, that there are two separate and distinct products involved, a tying product and a tied product. Two, Texaco has sufficient economic power in the tie–in market to coerce purchase of the tied product. Three, Texaco, in fact, coerced Plaintiff to purchase the tied product. Four, that here were anticompetitive effects on the tied market. And five, a not insubstantial amount of interstate commerce in the tied market was involved.

No further explanation of these five elements was proferred. While the bare bones of the charge was correct, it did little else to direct the jury toward proper consideration of the facts. How, for example, would a jury understand that "sufficient economic power" does not equal mere bigness, or that it requires some advantage not shared by other competitors? Our own analysis of the tying problem in this very opinion indicates the level of care necessary for understanding. A charge to the jury, especially in as complex an area as antitrust law, should avoid sacrificing clarity for brevity.

18. Both *United New York* and *Morrissey* deal with claims improperly submitted to the jury.

Although Texaco bases this appeal on the district court's failure to grant a judgment notwithstanding the verdict and a new trial, it could just as well have appealed the court's denial of its two motions for directed verdict, apparently made both after plaintiff's *and* defendant's case. For purposes of this appeal, the directed verdict and JNOV considerations are functionally equivalent. *See Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir. 1975). The contract and tying claims never should have reached the jury. Once they did, however, and a general verdict was returned, the judge erred further by failing to grant a JNOV.

19. Should appellee prevail on retrial, we must caution the judge to exercise greater supervision on the determination of damages. Although damages may be ascertained from a jury's just and reasonable inference from proof of the wrongful act, its tendency to injure plaintiff's business, and evidence of decline in profits, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), there must nevertheless be a reasonable foundation from which a jury can calculate the amount of damages. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1352 53 (3d Cir. 1975). When the evidence presented precludes such rational consideration, it must be excluded. *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d

906, 912 13 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

Appellee's expert Victor Cino, a New Jersey Shell station dealer, calculated future lost profits by using the actual gasoline sales volume figures from Yentsch's station, operated by a new dealer, for 1972 through 1975, and then by using the 1975 figure, 1,134,000 gallons, as a surrogate for years 1976 though 1981. Yet, Cino knew before he testified the actual station figures from 1976 through part of 1979, figures which showed a *substantial* drop from 1975. (801,300 gallons in 1976; 724,800 in 1977; 639,-500 in 1978; 562,320 in 1979, as projected from the first five months). We can see no reason to use 1975 as a model year instead of actual figures other than to inflate future profits and increase the damage award. Cino admitted as much—when asked whether using the actual figures would have been "a more honest way to calculate Mr. Yentsch's alleged losses," he responded, "I don't know if it would be more intelligent. That might have been more honest . . . ." Certainly that portion of the testimony dealing with the later years should have been excluded from jury consideration.